AUSA:   Anca Pop         Telephone:  (989) 895-5712

AO 106 (Rev. 04/10)  Application for a Search Warrant    Special Agent:   Bryan Butler      Telephone:  (989) 892-6525

# UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>2150 M-61, BENTLEY, MICHIGAN | )<br>)<br>)<br>)<br>)<br>) |

Case No.   1:19-mc-51081-4
Judge: Ludington, Thomas L.
Filed: 07-24-2019

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Michigan_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- [x] evidence of a crime;
- [x] contraband, fruits of crime, or other items illegally possessed;
- [x] property designed for use, intended for use, or used in committing a crime;
- [ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§1343 and 1349 | Participated in a fraud scheme |
| 18 U.S.C. §§ 1956 and 1957 | Money laundering |

The application is based on these facts:

See attached AFFIDAVIT.

- [x] Continued on the attached sheet.
- [ ] Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Bryan Butler, FBI
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:   July 24, 2019

_____
*Judge's signature*

City and state:   Bay City, Michigan

Patricia T. Morris     U. S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

IN THE MATTER OF THE SEARCH OF
2150 M-61, BENTLEY, MICHIGAN

Case No.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Bryan M. Butler, being duly sworn, state as follows:

### Background of Affiant

1.     I make this affidavit in support of an application for a warrant to search the premises known as 2150 M-61, Bentley, Michigan, ("**Target Residence**"), described in Attachment A and incorporated here by reference, for the things described in Attachment B to this affidavit.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the FBI's office in Bay City, Michigan. I have been employed by the FBI as a Special Agent since January 2010. I have experience investigating violations of federal criminal law, including wire fraud, in violation of Title 18 U.S.C § 1343; conspiracy to commit wire fraud, in violation of Title 18 U.S.C § 1349; and money laundering in violation of Title 18 U.S.C. §§ 1956 and 1957 ("Subject Offenses").

3.     The facts set forth in this affidavit are based upon my personal familiarity with the facts and circumstances of this investigations, my experience as a law enforcement officer, discussions with other federal law enforcement officers, the experience of other federal law enforcement officers, law enforcement discussions with FBI forensic accountants, my discussions with State of Michigan certified public accountants, and interviews of a witness.

4.     Since approximately March 2019, I have been involved in an investigation of Surveying Solutions, Inc. (SSI), Jeffrey Bartlett, Andrew Semenchuk, Brian Bartlett, Anthony Thelen, and Adam Ball, ("Target Subjects"), and others, along with the United States Department

1

of Transportation, Office of Inspector General. Based on my training and experience, and the facts set forth in this affidavit, there is probable cause to believe that the Target Subjects have committed the Subject Offenses by overbilling the Michigan Department of Transportation (MDOT) through the creation of fictitious expenses which were passed onto MDOT. The fictitious expenses were ultimately paid by MDOT and also caused profit payments from MDOT to SSI to be inflated. Probable cause also exists to believe that Target Subjects and others committed money laundering, in violation of 18 U.S.C. § 1956, by engaging in financial transactions from proceeds of specified unlawful activity derived property to conceal the source and location of that property; and, in violation of 18 U.S.C. § 1957, by engaging in financial transactions involving more than $10,000 from proceeds of specified unlawful activity.

### Background of the Investigation

5.     The government is currently investigating Surveying Solutions Inc. ("SSI") in connection with the Subject Offenses. Through this affidavit, I submit that there is probable cause to believe SSI overbilled MDOT by creating fraudulent overhead expenses. Specifically, SSI's executives organized shell companies to create fictitious expenses. The fictitious expenses were ultimately paid by MDOT and also caused profit payments from MDOT to SSI to be inflated.

#### Surveying Solutions, Inc.

6.     According to Michigan Secretary of State records, Jeffrey Bartlett and Guy Spreeman incorporated SSI on August 17, 2001.[1] SSI is a surveying company, with its principal place of business located at 4471 M-61, Standish, Michigan ("SSI Headquarters").

7.     On or about June 10, 2017, SSI represented to MDOT Office of Commission Audits (OCA) that its executives were: Andrew Semenchuk, Jeffrey Bartlett, Brian Bartlett, Anthony

---

[1] Guy Spreeman passed away in 2011. Semenchuk became the majority owner of SSI in 2012. In December 2018, Semenchuk relinquished his ownership in SSI and became an advisor to SSI.

2

Thelen, and Adam Ball. SSI also represented that it was owned by Jeffrey Bartlett and Andrew Semenchuk.

8.     According to records maintained by MDOT for fiscal years 2016 through 2018, SSI was a prime contractor or subcontractor on over 150 projects let by MDOT. MDOT provided documentation indicating that there were $25.8 million of federal funding in the $29.3 million of contracts that SSI worked as a prime and subcontractor. From 2016 through 2018, $14.3 million were paid to SSI for work as a prime contractor through MDOT. I have observed that the payments were made via electronic funds transfer to a Huntington National Bank account held by SSI.

9.     The United States Department of Transportation (USDOT), through the Federal Highway Administration (FHWA), funds highway construction projects throughout the United States. The federal funds are passed on to the various states which then enter into contracts to have the construction work performed. Typically, USDOT funds approximately 80% to 90% of the total cost of the construction project with the state. MDOT is the contracting agency that is responsible for the administration of federal and state highway construction funds in Michigan.

10.    When MDOT awards a contract, it reserves the right to audit the contractor (and subcontractors) to ensure that they have complied with the contract provisions, as well as with federal and state regulations. The MDOT OCA is an agency within MDOT responsible for conducting such audits.

11.    In 2018, MDOT OCA contacted SSI and scheduled a Certified Public Accountant (CPA) work paper review with SSI. In November 2018, MDOT OCA auditors conducted an on-site review at SSI Headquarters. During the review, MDOT OCA employees identified procedures, conduct, and statements that were indicative of fraudulent billing practices by SSI and its executives. MDOT OCA auditors estimated SSI overbilled MDOT by as much as $9.2 million

3

during fiscal years 2016 to 2018.

12.     During the review, MDOT OCA reviewed, among other things, records maintained at SSI Headquarters. Records reviewed included time cards for SSI employees, lease agreements with 2SI Development, LLC, lease agreements with 3SI Building and Leasing, LLC, and a Managed Storage and IT Service Level Agreement with Southfield IT Services.

**Background of Engineering and Design Contracts:**

13.     MDOT contracts with SSI are let in accordance with Title 40 and Chapter 11 of the United States Code, which is commonly known as the Brooks Act. Per the Brooks Act, MDOT is required to negotiate engineering and surveying contracts with the most highly qualified firm. MDOT is required to pay the firm a "fair and reasonable" rate. The payment rate was determined through a calculation of direct labor costs and overhead expenses.

14.     From at least 2016 through 2018, MDOT paid SSI an amount that represented direct costs, which included the number of hours SSI employees worked on various jobs, plus an 'indirect cost rate' multiplier which was intended to compensate SSI for certain overhead expenses. The indirect cost rate was determined, in part, upon representations SSI made during an annual pre-qualification process.

15.     With SSI, as with all MDOT contractors and subcontractors, calculation of the indirect (overhead) rate was governed by "Cost Accounting Standards" set forth in the Federal Acquisition Regulations.[2]  In short, the overhead rate was calculated by dividing annual overhead expenses by the direct labor costs of business for the previous year. FAR Part 31 controls what costs can be included in overhead.

---

[2] The Federal Acquisition Regulations are codified at Title 48, Part 31 of the Code of Federal Regulations (CFR). During the pre-qualification process, SSI's owners (Jeffery Bartlett and Andrew Semenchuk) and office manager (Courtney Stodolak) certified that they were familiar with FAR Part 31.

16.     SSI sent the independent audit to MDOT OCA along with the following records: (i) a prequalification questionnaire, (ii) a Statement of Direct Labor, Fringe Benefits and General Overhead, (iii) Balance Sheet, and (iv) Statement of Income.  Once the overhead rate was accepted by MDOT OCA, SSI applied it to invoices sent to MDOT.

17.     SSI invoiced MDOT relative to the amount of hours SSI employees worked on various jobs. SSI submitted the names of employees who worked on a project, the hours worked by the respective employee, and their hourly rate.  The above information established a labor cost for a given invoice.  SSI multiplied the direct labor cost by the overhead rate.

18.     In short, MDOT's payments to SSI were determined upon the following formula: (direct labor costs x overhead rate) x fixed fee. The fixed fee was always 11%.  The fixed fee was intended to provide SSI a profit margin.

19.     Based upon the facts set forth herein, I submit that there is cause to believe SSI's executives created shell companies and fraudulent invoices to inflate overhead expenses and drive up the firm's overhead rate. Specifically, SSI executives Jeffrey Bartlett, Andrew Semenchuk, Brian Bartlett, Anthony Thelen, and Adam Ball, and others, created three shell companies to inflate overhead in three categories: (i) Southfield IT Group (IT expenses); (ii) 2SI Development, LLC (equipment and vehicle rental costs); and, (iii) 3SI Building and Leasing, LLC (real property rental expenses.)

**Southfield IT Group**

20.     SSI inflated its overhead rate by asserting it paid a third party vendor, National Elevation Certificates, d/b/a Southfield IT Group ("Southfield IT"), for managed IT services. However, Southfield IT was a shell company created by SSI executives. Southfield IT received

5

99.2% of its funding from SSI and .7% from SSI's executives. 97% of the money SSI paid to Southfield IT was subsequently transferred into the personal bank accounts of Adam Ball, Sarah Ball, and Tara Semenchuk. I have determined that 'Southfield IT Group' is a trade name for National Elevation Certificates, a limited liability company organized in the State of Wyoming at the direction of Adam Ball.

21.     SSI represented to the State of Michigan that during fiscal years 2015, 2016, and 2017 it spent $3,485,649.79 on managed IT services. The company disallowed a portion of those costs[3], but included $1,575,304.30 within its claimed overhead expenditures. Based upon a review of Southfield IT's bank account, the company spent less than $145,184.73 on IT services and internet connectivity from January 2016 through February 2019. Accordingly, I submit there is probable cause to believe SSI overstated its IT expenses.

22.     When asked about the expenditures for managed IT services, SSI represented to MDOT OCA that Southfield IT Group was an unrelated third-party company located in Southfield, Michigan, which provided SSI managed IT services. SSI produced two Managed Storage and IT Service Level Agreements between "Southfield IT Services" and SSI. The two annual agreements covered from February 1, 2016, through February 1, 2018.

23.     The above service agreements did not provide any contact information for Southfield IT Services. Nor were they signed by a Southfield IT Services representative. SSI President Andrew Semenchuk signed the agreement on behalf of SSI.

24.     During the audit, Semenchuk produced an invoice from Southfield IT Group.  It

---

[3] The company disallowed a portion of the managed IT expenditures and stated that they were "direct costs/directly associated costs unallowable." During the November 2018 audit conducted by MDOT OCA, auditors asked Semenchuk to explain why certain Managed IT Service costs were removed from overhead expenses. Semenchuk stated, "62% of our data storage is used for contract and geospatial data. We do not bill specifically for this data. We only include 38% which is used for internal storage not directly related to projects."

identified a mailing address for Southfield IT at PO Box 1201 in Standish, Michigan. The PO Box is registered to National Elevation Certificates, LLC, (NEC) and was obtained by SSI Office Manager Courtney Stodolak.[4]

25.     SSI executive Adam Ball used a company in Wyoming to register Southfield IT with the State of Wyoming. Northwest Registered Agent Service (NRAS), operates in Buffalo, Wyoming, and provides business entity formation and registered agent services. NRAS filed Articles of Organization for NEC.  On January 6, 2016, SSI's CPA Stephen Grzesiak registered Southfield IT Group as a trade name for National Elevation Certificates, LLC.

26.     I have reviewed Huntington National Bank (HNB) account xxxxxx0024 held in the name of National Elevations Certificates, aka, Southfield IT Group[5] for the time period of January 2016 through February 2019. The account was opened at First Merit Bank, now HNB, on April 27, 2015. At the time the account was opened, Stodolak, Ball, Brian Bartlett, and Thelen were signatories. On January 21, 2016, an updated signature card was put on file removing Brian Bartlett and Thelen. The signature card added Ball's wife Sarah Ball as a signatory.

27.     For the time period of January 2016 through February 2019, the account received 99.2% of its funding from SSI. Deposits from target subjects contributed an additional .7% of funding.

---

[4] According to records obtained from the United States Postal Service Connie Proulx, a former office manager for SSI, obtained PO Box 1202 for 3SI Building and Leasing, which is discussed in more detail below. Stodolak also obtained Box 24 in Standish, Michigan, for 2SI Development, LLC.
[5] The account was originally held in the name of National Elevations Certificates. The trade name Southfield IT Group was added to the account title on January 21, 2016.

7

28.     For the same time period, NEC made the following expenditures:

| DESCRIPTION | AMOUNT | % of Withdrawal |
|---|---|---|
| Adam Ball | $3,955,057.00 | 71% |
| Tara Semenchuk | $776,601.00 | 14% |
| Sarah Ball | $602,674.00 | 11% |
| Martin Chevrolet[6] | $62,920.64 | 1% |
| Network Services Group | $53,118.15 | 1% |
| Internet Service Providers | $52,689.58 | 1% |
| Other Expenditures | $39,377.00 | 1% |
| Grand Total | $5,566,909.97 | 100% |

29.     Based on the foregoing, there is probable cause to believe that at least 97% ($5,334,332) of the money SSI paid to NEC d/b/a Southfield IT Group was passed onto SSI executives and their spouses from January 2016 through February 2019. No more than three percent was used to cover managed IT services and internet connectivity.

30.     I have also reviewed personal bank accounts the Balls held at Huntington. I did not observe expenditures consistent with IT management. Rather, I observed that the Balls paid the United States Treasury approximately $1,393,721 and transferred at least $1,850,000 to SEI Private Trust Company.

31.     There is cause to believe SSI's executives conspired to create and operate NEC as a shell company. As noted above, Brian Bartlett, Adam Ball, Anthony Thelen and Courtney Stodolak were originally signatories on the account. SSI's majority owner, Andrew Semenchuk, signed nearly every check SSI wrote to NEC or Southfield IT Group. His wife received more than $776,601 from NEC/Southfield IT's bank account. SSI office manager Courtney Stodolak signed

---

[6] On August 30, 2016, National Elevation Certificates issued a $62,920.64 check to Martin Chevrolet (signed by Adam Ball). On July 11, 2019, FBI Agents observed Sarah Ball drive a 2016 Chevrolet Suburban registered to National Elevation Certificates, which title was issued on August 31, 2016. Sarah Ball drove kids to day care and then to a work-out facility. She did not appear to use the vehicle for commercial purposes.

nearly every check drawn on the Southfield IT Group account, including the checks made payable to Adam and Sarah Ball.[7]  Stodolak also obtained a PO Box for the fictitious entity in Standish. The PO Box address was used on the invoice Semenchuk delivered to MDOT auditors.

32.    I believe Network Services Group (NSG), located in Saginaw, Michigan, provided SSI IT management services.  According to its website, NSG is a "cutting edge company that specializes in IT Support, Managed Services, and Cloud Integration for small to medium sized businesses in the Great Lakes Bay Region are that typically do not employ in-house IT staff." SSI's website is hosted by NSG.[8]

33.    I have interviewed Individual A, the owner of Network Services Group (NSG). Individual A began providing IT services to SSI in 2009.  In early 2016, Semenchuk began directing Individual A to re-issue certain SSI invoices to Southfield IT Group. Individual A understood that NSG's work always supported SSI regardless of it was billed to SSI or Southfield IT Group.

34.    I have reviewed SSI's statements of direct labor and overhead for the years immediately preceding the formation of NEC / Southfield IT Group (2015). SSI did not claim managed IT services as an overhead expense in 2013 or 2014. By 2017 'managed IT services' was one of the largest overhead expenditures for SSI at $1,575,304.30.

35.    During the MDOT OCA November 2018 review, Semenchuk provided MDOT OCA an invoice SSI purportedly received from Southfield IT Group. The invoice, dated December 27, 2017, requested payment of $811,133.17 for "Additional Manage Storage Use." Specifically, the invoice itemized the following storage: "Additional SAN – 95,894 GB, Additional Cloud –

---

[7] The only check not signed by Courtney Stodolak was made payable to Martin Chevrolet for $62,920.64. That check was signed by Adam Ball.
[8] SSI utilizes the website www.ssi-mi.com.

145,030 GB, Additional NAS – 65,468 GB[.]" Individual A stated that he was familiar with the storage capacity of SSI and Southfield IT Group. According to Individual A, SSI and Southfield IT Group do not have the capacity to provide the storage itemized in the invoice.

36.     Based on the foregoing, I submit there is probable cause that SSI executives Andrew Semenchuk, Jeffrey Bartlett, Brian Bartlett, Thelen, Ball, and others, conspired to establish and operate Southfield IT as a shell company for the purpose of generating overhead expenses and inflating SSI's overhead rate. MDOT OCA estimated that from 2016 through end of fiscal year 2018, MDOT overpaid SSI approximately $1,915,945 as a result of the fraudulent representations regarding IT expenditures.

### 3SI Building and Leasing, LLC / 2SI Developments, LLC

37.     3SI Building and Leasing, LLC (3SI) and 2SI Developments, LLC (2SI) are companies owned by SSI executives, operated out of SSI's office, and administered by SSI's office manager. The companies hold titles to real and personal property, which were obtained with proceeds received from SSI. 2SI and 3SI leased the property to SSI at rates which exceeded fair market value. SSI included the lease costs in its overhead rate and thereby passed them on to MDOT.

38.     I have reviewed financial accounts for 2SI and 3SI. I have not observed the entities conducting significant financial transactions with any clients other than SSI. The companies (2SI and 3SI) are funded nearly exclusively by SSI, its executives, or their spouses.

39.     Although applicable federal regulations (FAR Part 31) allow some recovery of rental costs, it prohibits a contractor from recovering payments of inflated rental costs to a commonly controlled entity. Where a contractor rents property from a commonly controlled entity, it may only include in its overhead costs those lease expenses which do not exceed normal costs of

ownership, such as depreciation, taxes, insurance, facilities capital cost of money, and maintenance.

40.     For fiscal years 2016 and 2017, SSI claimed lease expenses to 2SI and 3SI, which exceeded the normal costs of ownership. At the time SSI submitted its prequalification package, its president, Andrew Semenchuk certified that all known material transactions or events that have occurred affecting the company's ownership, organization and indirect cost rates had been disclosed. Semenchuk also certified that the proposal only contained allowable costs and that it did not include any costs which were expressly unallowable under applicable cost principles of the FAR of 48 CFR part 31.

### 3SI Building and Leasing, LLC

41.     There is probable cause to believe SSI executives created 3SI for the purpose of charging above-market rents to SSI which were passed along to MDOT via SSI's indirect cost rate. 3SI was organized on February 6, 2009 by Jeffrey Bartlett, Brian Bartlett, and Anthony Thelen. In December 2010, Jeffrey Bartlett assigned his ownership interest of 3SI to Brian Bartlett and Anthony Thelen.  However, all three of the founding members remain signatories on 3SI's bank account.  SSI Office Manager Courtney Stodolak is also a signatory on 3SI's bank account.

42.     3SI owns the real property at which two of SSI's offices are located at. 3SI owns SSI Headquarters (4471 M-61, Standish, MI), and 1000 S. US 27, St. Johns, MI (the "St. Johns Office.)

43.     3SI purchased the land for SSI Headquarters on February 6, 2009, for $72,000. On August 5, 2009, 3SI gave Citizens Bank a mortgage of $500,000 in exchange for a construction loan. As such, I believe 3SI acquired ownership to SSI Headquarters for $572,000 or less.[9] The

---

[9] A subpoena has been issued to Huntington Bank to determine how much was drawn on the construction loan to build SSI Headquarters Building.

Arenac County Treasurer has assessed the property to be valued at $454,400. An appraisal conducted by Colliers International valued the property at $198,000.[10] According to SSI's general ledgers, SSI paid 3SI $486,240 to rent the Headquarters Building from 2015 through 2017.

44.    3SI purchased the St. Johns Office for $111,000 in 2010. According to its general ledgers, SSI paid 3SI $109,780 to lease the St. Johns Office from 2015 through 2017.[11]

45.    During 2017, the St. Johns Office was rented for $3,660 per month.

46.    When SSI included its lease expenditures for the SSI Headquarters and the St. Johns Office in its overhead rate, SSI did not disclose that the landlord was a related party. As set forth above, where a contractor rents property from a commonly controlled entity, it may only include in its overhead costs those lease expenses which do not exceed normal costs of ownership, such as depreciation, taxes, insurance, facilities capital cost of money, and maintenance.

47.    MDOT OCA auditors estimated that in 2017 SSI overbilled for the Headquarters Building by approximately $197,182. Using conservative (favoring SSI) figures for building value, MDOT OCA auditors estimated that the SSI Headquarters Building had an initial value of $450,000.[12] Because depreciation on commercial buildings is set for a 39-year useful life, the annual depreciation on the Headquarters Building should have been $11,538. Taxes on the facility were approximately $9,000. Accordingly, the normal cost of ownership for the Headquarters Building in 2017 should have been approximately $20,538. In 2017, SSI paid 3SI $217,720 for the use of SSI Headquarters.

48.    Based upon my review of SSI's general ledgers, I believe SSI overbilled MDOT for usage of the Headquarters Buildings and the St. Johns Office for fiscal years 2016, 2017, and 2018.

---

[10] The Colliers International valuation used the sales comparison approach which compared the subject property to recently sold comparable commercial properties in Bay City, East Tawas, and Freeland, Michigan.
[11] During the November 2018 audit, SSI provided general ledgers for fiscal years 2015, 2016, and 2017.
[12] State of Michigan property records indicate the property had a value of $372,800 for the 2017 tax year.

According for my review of 3SI's financial records for 2018, I believe SSI continued to make inflated rental payments to 3SI throughout 2018 also.

49.   As set forth above SSI employees Jeffrey Bartlett, Andrew Semenchuk, and Courtney Stodolak certified that they were familiar with FAR Part 31.  SSI properly disallowed $11,263 relating to a rental agreement with Andrew Semenchuk.  It also disclosed that Brian Bartlett was Jeffrey Bartlett's brother in the context of payment for executive bonus.  However, SSI did not disclose to MDOT during the prequalification process that Brian Bartlett or Anthony Thelen were the owners of 3SI. Accordingly, there is cause to believe SSI executives attempted to conceal that the rentals from 3SI Building and Leasing, LLC were a related party transaction.

50.   In approximately 2010 MDOT OCA reviewed the costs SSI reported on invoices related to certain MDOT contracts. As part of the review, an unknown employee of SSI completed a document entitled 'AASHTO Internal Control Questionnaire for Consulting Engineers.' The form asked, "If the company rents facilities from another organization, are any of the company's owners/stockholders, or members of their immediate family, also owners/stockholders in the other organization? ... If 'yes' please explain:"  In response SSI provided the following hand-written notations, "New building. Moved in 10/2009. Jeff is co-owner of building." "St. John office brought 1/2010" [sic] "Prior to 2009 – rent from outside company" [sic]. The questionnaire was not signed or dated. Guy Spreeman submitted an updated questionnaire on January 13, 2010. The updated questionnaire stated in response to the same question, "Effective 10/2009, Principal Jeff Barlett [sic] is the co-owner of the new office building in Standish. Effective 1/2010, Jeff Barlett [sic] is co-owner of the building in St. John." The response did not state that Brian Bartlett and Anthony Thelen held the remaining ownership interests in the building.

51.   On May 20, 2010, an MDOT Senior Auditor, Individual B, concluded that as of

October 2009 common control existed for SSI Headquarters and as of January 2010 common control existed for the St. Johns office. In early 2011, Jeffrey Bartlett corresponded with Individual B regarding SSI's overhead rate computation for fiscal year ending December 31, 2010. Via e-mail, Individual B asked Jeffrey Bartlett, "Per our discussion during the audit in 2010, common control exists for the Standish property. Please provide the supporting document for the actual expenses (depreciation and other expenses) incurred by the landlord of the Standish property."

52.     On February 16, 2011, Jeffrey Bartlett replied to Individual B via email which attached a letter that stated, "As discussed the other day on the phone, please consider this letter my sworn statement that I do not in any way own any part of the Standish Property that we lease. We changed this immediately after you notified us of the rule change."[13]

53.     As noted above, in December 2010, Jeffrey Bartlett assigned his ownership interest of 3SI to Brian Bartlett and Anthony Thelen.

54.     MDOT OCA estimated that from 2016 through end of fiscal year 2018, MDOT overpaid SSI approximately $518,550.58 as a result of the fraudulent representations regarding real property rental costs.

***2SI Developments, LLC***

55.     There is probable cause to believe SSI executives created 2SI Development, LLC, for the purpose of charging above-market lease expenses to SSI which were passed along to MDOT via SSI's indirect cost rate. 2SI was organized in 2004 by Brian Bartlett who listed himself as a member. According to loan documents I have reviewed, I believe Anthony Thelen is also a member of 2SI. 2SI has maintained bank accounts at Huntington National Bank and Chemical Bank.  The authorized signatories for both accounts were: Jeffrey Bartlett, Brian Bartlett, Anthony

---

[13] I have spoken with MDOT OCA Auditors and learned that rules regarding common control did not change from 2008 through 2011.

Thelen, Courtney Stodolak, and Connie Proulx. According to records maintained by the Michigan Secretary of State, 2SI's registered agent is SSI's CPA Stephen Grzesiak. I submit there is cause to believe 2SI inflated lease expenses for mobile scanning devices and vehicles.

**Mobile Scanners**

56.     During the November 2018 work paper review, MDOT OCA auditors obtained copies of SSI's lease agreements with 2SI. The agreements were produced for years 2013 through 2017. According to the 2017 agreement, SSI leased a Riegl VMX-1HA and a Riegl VMX 250, which are mobile surveying scanners.[14] The lease agreement required minimum monthly rental payments of $13,000. Per the lease agreement, the minimum monthly lease payment only entitled SSI to use the scanner 26 times in a one year period.

57.     Specifically, the lease stated as follows:

> "The Lessee [SSI] shall be allowed to use the scanner for up to 26 days in a fiscal year prior to incurring a daily usage fee for the scanner, At the end of each fiscal year, the Lessee shall pay the Lessor a usage fee of 6,000/day for each day in excess of 26 allowable days covered by the minimum monthly lease payments." [sic]

58.     According to its general ledger, in 2017 SSI paid the monthly rental fee ($156,000) and an additional $1,398,045 purportedly for additional usage of the scanner. SSI's contracts with MDOT required SSI to maintain documentation of overhead expenditures for at least three years. In this scenario, SSI was required to maintain records of which days it used the scanner to support the 'per-use' fees it paid to SSI. During the 2018 MDOT OCA work paper review, auditors asked Semenchuk to provide a list of the daily usage for the scanner. Semenchuk provided a spreadsheet which documented that the scanner was used 40 days.

---

[14] The lease agreement appears to treat the two scanners as one device. The lease defines both as "scanner" and refers to scanner in a singular tense throughout the 2017 lease.

59.     According to the documented usage, SSI should have paid no more than $84,000 for additional usage.[15] Instead, SSI claimed $1,398,045 for additional scanner usage. I believe the lease agreement between 2SI and SSI was created to artificially generate overhead expenditures. Similarly, unsupported scanner usage payments were made to further inflate overhead expenses. Because 2SI operated as a shell company for SSI, SSI should have only included in its overhead rates, the actual cost of ownership for the two scanners.

60.     According to MDOT OCA auditors, the combined cost to purchase the scanners would be approximately $1,000,000. Accordingly, the combined depreciation value for both units should have been approximately $200,000 per year (for a five year depreciation period.) As such, SSI should have claimed an overhead cost of approximately $200,000 for the scanners.  Rather, SSI paid 2SI $1,554,045 to use the scanners for one year.

61.     There is cause to believe SSI coordinated the acquisition of the scanners in all material respects.  On August 6, 2012, *Point of Beginning* magazine published an article written by SSI Director of Geospatial Services Brian Bailey. In the article, Bailey writes, "SSI ... acquired a Riegl VMX-250 in April 2011." The article provides a photograph of an SUV with a scanner attached to it.  The SUV depicted in the photograph has the SSI logo on it.  The caption under the photograph states, "SSI's mobile mapping system, MoLi."

62.     I have watched an interview of Jeffrey Bartlett wherein he acknowledges that SSI purchased the scanners. On or about July 26, 2012, YouTube user GeoDataPoint posted a video of *Point of Beginning* Editor Christine Grahl interviewing Bailey and Jeffrey Bartlett. While introducing Jeffrey Bartlett, Grahl stated, "In April 2011, Surveying Solutions purchased a Riegl VMX-250 mobile LiDAR system." Grahl asked Jeffrey Bartlett about SSI's process of purchasing

---

[15] The lease allowed 26 days of usage without additional charge. As such, SSI should have paid for 14 days of additional usage at $6,000 per day ($84,000).

the scanner. She stated, "When your firm purchased the VMX-250 system, you went through a process of evaluating the technology to make sure you chose the best one." Jeffrey Bartlett nodded in agreement. Grahl continued, "What did that process look like and how did you go about comparing the different systems?" Jeffrey Bartlett stated, "Yeah, it's a great question. We had a lot of heartache with that question ourselves. Myself and a key employees of SSI, we went through a process of elimination type thing with all the different providers of the mobile LiDAR. … One of the key things of course was price, because there's very few firms that have this type of budget built into their annual equipment budget."

63.    Similarly, in online publications, Riegl has stated that it sold the scanners to SSI. On March 12, 2018, Riegl posted an article to its website entitled "SSI: Investing in 3D Technology." It stated, "Editors Note: One of our customers, Surveying Solutions, Inc., is currently being featured on *LIDAR News*." The blog then provided the article from *LIDAR News* which quotes Semenchuk and details SSI's purchase of the two scanners and Riegl software. The article reads:

> "SSI purchased their first mobile LIDAR system in 2011. As part of their investigation of the available systems on the market, SSI set up a test course… Andy [Semenchuk] recalls, 'We requested two manufacturers, Riegl and a competitor, to come to Michigan and drive the course that we had set up.  … Over the years, SSI has continued to invest in Riegl technology. In 2016, they purchased their second mobile LiDAR system, the Riegl VMX-1HA…"

The article concluded with another quote from Semenchuk: "We are doing things today that we did not anticipate doing when we bought our first system in 2011."

64.    For the reasons set forth above, these expenditures should have been identified as related party transactions. As a result SSI was prohibited from including expenses exceeding actual cost of ownership in its overhead. The actual expense SSI could have claimed for the LiDAR equipment would have been the depreciation cost of approximately $200,000 per year instead of

the leased costs of $1,554,045.

65.     MDOT OCA estimated that from 2016 through end of fiscal year 2018, MDOT overpaid SSI approximately $3,893,631 as a result of the fraudulent representations regarding mobile scanner expenditures.

**Vehicles**

66.     2SI conducted similar transactions with regards to vehicles used within the SSI work-force fleet. 2SI leased vehicles to SSI. Per the five lease agreements for years 2013 through 2017, SSI agreed to pay 2SI $1,700 per month for new vehicles and $1,000 per month for used vehicles. Anthony Thelen signed the lease agreements as member for 2SI.[16]  Semenchuk signed on behalf of SSI, as President.

67.     According to the SSI general ledger, the company paid 2SI $948,300 in 2017 for the lease of 56 vehicles. I submit there is probable cause to believe that SSI paid above-market lease rates for use of the vehicles. By way of example, one of the 56 vehicles leased in 2017 was a 2014 Chevrolet Silverado Extended Cab pick-up truck. SSI paid 2SI $1,700 per month ($20,400 per year) for the vehicle. SSI began leasing this vehicle from 2SI in 2014. The four year total of these lease payments was $81,600. The MSRP of a 2019 Chevrolet Silverado work truck is $35,310.[17]

68.     Because SSI leased the 2014 Silverado from 2SI, a commonly controlled entity, it should have only included the actual cost of ownership (taxes, maintenance, cost of money, and depreciation) in its overhead calculation.  Depreciation for a $35,310 2014 vehicle would have been approximately $7,062. Additional overhead expense for taxes and maintenance would not justify the total of $20,400 paid to 2SI and included in overhead.

---

[16] The lease agreements were obtained by MDOT OCA during the CPA work-paper review. The lease agreements were not provided during the annual pre-qualification process.
[17] I have observed that many of the SSI work trucks have after-market truck toppers or emergency lights. However, in my experience, the costs to purchase aftermarket accessories would not justify the inflated lease costs.

69.     I have reviewed SSI's general ledger for fiscal years 2015, 2016, and 2017. I also reviewed deposits made to 2SI's bank account.  The review shows consistent, although increasing, payments from SSI to 2SI through 2018.

70.     MDOT OCA estimated that from 2016 through end of fiscal year 2018, MDOT overpaid SSI approximately $2,038,528.70 as a result of the fraudulent representations regarding vehicle leases.

**Disadvantaged Business Enterprise**:

71.     As set forth above, SSI was founded in 2001 by Jeffrey Bartlett and Guy Spreeman. With Spreeman as the majority owner, the company became certified as a disadvantaged business enterprise (DBE). Spreeman passed away in January 2011. Upon his death, majority ownership of SSI passed from his estate back to the corporation while SSI sought a buyer for the company.

72.     Semenchuk worked for MDOT from 2000 through 2011. In March 2011 Semenchuk left his position as Chief Professional Surveyor and founded Geo Precision Services, Inc. (Geo). Thereafter the company obtained DBE certification with MDOT.

73.     At or about that time, Semenchuk told Individual A that he was not allowed to immediately begin working for SSI. Semenchuk explained that he was restricted from working with an MDOT contractor for a period of time after leaving MDOT. At Semenchuk's request, Individual A created an email extension which attributed Semenchuk's e-mails to Geo Precision Services, Inc. Individual A understood that although Semenchuk used the Geo email extension, he worked for SSI the entire time.

74.     In December 2012, Semenchuk obtained a 51% majority ownership of SSI. In April

2013, SSI applied for DBE certification.[18] During the application process, MDOT attempted to obtain information about SSI's relationship with 2SI and 3SI.

75.    MDOT denied SSI's DBE certification and cited that Semenchuk did not satisfy the control requirement for DBE status. In particular, MDOT focused on SSI's relationships with 2SI and 3SI.   SSI appealed the decision to the United States Department of Transportation Departmental Office of Civil Rights (the "Department"). The Department reversed MDOT's decision and certified SSI as a DBE. In its opinion, the Department made the following observations:

> MDOT focused on SSI's relationship with 2SI Development, LLC (2SI) and 3SI Building and Leasing, LLC (3SI). SSI leases two of its three office complexes from 3SI; SSI also leases 25 vehicles, survey equipment, and a mobile scanner from 2SI. Two SSI employees, Brian Bartlett (brother of Jeffrey Bartlett, the 48% minority owner of SSI) and Anthony Thelan, are owners of 2SI and 3SI, though the record is unclear as to their percentage ownership stakes in those companies.
>
> MDOT requested that Mr. Semenchuk provide 2SI and 3SI's tax returns and other outside lease agreements in order to better ascertain the relationship between the companies. [footnote 7: See November 19, 2013 email exchange between Mr. Semenchuk and Ms. Penny Ward of MDOT.] 2SI and 3SI citing privacy concerns for their other clients, [footnote 8: See November 19, 2013 email from Mr. Semenchuk to Ms. Ward: "I have spoke with Brian and Tony. At this point they are unwilling to provide the tax returns or a copy of the leases (privacy issues with other clients). Is there any other type of information that would be helpful to you? Should I see if they would be willing to provide a letter stating the fact that they have other leases?"] refused to provide that information to Mr. Semenchuk, who then told MDOT that these were totally separate companies over which he wielded no control, as neither he nor any owners of SSI possessed any ownership interest in them, thus he could not force them to provide any information they did not wish to turn over. [footnote 9: See November 20, 2013 email from Mr. Semenchuk to Ms. Ward: "I made another attempt to have 2SI and 3SI provide their tax statements per your

_____

[18] In June 2012, approximately one year after Semenchuk ended his employment with MDOT, Geo obtained a 51% majority stake in SSI, intending to make SSI a subsidiary of Geo. In October 2012, MDOT revoked Geo's DBE status based upon its purchase of SSI, stating that Geo was no longer operating as an independent business. Thereafter, Semenchuk dissolved Geo and obtained a 51% ownership interest of SSI in his individual capacity.

request and they will not. I am in no position to force any of my vendors to provide that type of documentation and hope that you realize that this request reaches beyond my ability to provide said documentation. During this whole review process I have been open and transparent and have cooperated with every request that has been made by your office regarding additional information. As mentioned before, these entities (2SI and 3SI) are totally separate and distinct entities from SSI and I have no control over their actions."

76. Based upon the evidence in the record and relying upon Semenchuk's representations, the Department concluded that Brian Bartlett and Anthony Thelen's relationship as employees of Semenchuk did not compromise SSI's independence from 2SI or 3SI.[19]

77. The representations SSI made, through Semenchuk, to MDOT during the DBE procedure are inconsistent with my review of more recent financial transactions. For example, 2SI and 3SI purportedly declined to provide tax information and lease agreements to MDOT because of "privacy issues with other clients." Semenchuk maintained 2SI and 3SI "were totally separate companies…" However, a review of proceeds deposited to 2SI and 3SI's accounts from January 2016 through February 2019 indicate that 2SI and 3SI have no other significant clients and are both nearly exclusively funded by SSI.

78. From January 5, 2016, through February 21, 2019, 3SI maintained an account at Huntington National Bank which received $831,318.00 in deposits. 99.8% of the deposits were from accounts controlled by SSI or 2SI Development, LLC.

79. Similarly, from January 19, 2016, through February 26, 2019, 2SI received $7,959,455.78 into accounts at Chemical and Huntington National Bank. 99.2% of the deposits were from SSI.[20]

---

[19] I have obtained information regarding the DBE administrative process from a United States Department of Transportation opinion which was published online.
[20] Insurance proceeds contributed an additional .5% towards total deposits. I have observed that vehicular insurance accounts were maintained in the name of Surveying Solutions, Inc.

80.     I have observed that at or about the time of the above-described DBE proceedings, SSI executives conducted transactions with third parties which did not treat SSI and 2SI as separate entities.  For example, in 2014 2SI obtained a car loan from Ally Bank. In furtherance of the loan application, Ally Bank received a "Certified Copy of Resolutions of Corporation" signed by Jeffrey Bartlett.  The corporate resolution stated:

> "Name of Corporation: SSI    I, Jeffrey Bartlett, hereby certify that I am the V-Pres of SSI (2SI) (the "Corporation"), a corporation duly incorporated and existing under the laws of the State of Michigan, and that the following resolutions (the "Resolutions") were duly adopted at a meeting of the Board of Directors of the Corporation (the "Board") duly held on 8/04/14, or, if permissible under applicable law, by unanimous written consent."

The form specified federal tax ID: 38-2706928, which is assigned to 2SI. It was signed by SSI owner Jeffrey Bartlett on August 4, 2014.  The form authorized 2SI to obtain credit from Ally Financial to purchase a 2014 Chevrolet Pickup Truck, VIN 1GCVKPEH8EZ36606 for $34,391.20.  According to a lease agreement SSI provided MDOT OCA, SSI leased the truck from 2SI for fiscal years 2015, 2016, and 2017 for a total of $44,400 to $61,200.[21]

81.     The vehicle lease agreement supplied to MDOT OCA identified 2SI's place of business as PO Box 24, Standish, Michigan.  However, on March 18, 2015, Brian Bartlett completed a vehicle loan application with Ally Bank which identified 2SI's place of business as SSI Headquarters. The loan proceeds were used to acquire a 2015 Chevrolet Silverado, which was later leased to SSI.

82.     Based on the foregoing, there is probable cause to conclude that SSI and 2SI did not operate as separate entities as Semenchuk represented during proceedings regarding SSI's DBE status.

---

[21] The lease agreement stated that SSI agreed to pay 2SI at a rate of $1,700 per month for new vehicle leases and $1,000 per month for used vehicle leases "as discussed prior with the Lessor."

**Payroll**

83.    For fiscal year ending December 31, 2017, SSI's payroll included four individuals who are spouses of SSI executives. Their positions were labeled "project assistants," but their time was allocated to: marketing, administration, or holiday. According to MDOT OCA's review of the payroll records, none of the relatives appear to have assisted on projects.

84.    The four relatives received end-of-year bonuses totaling $317,600. While SSI disallowed a significant portion of the related labor ($81,064) from the indirect cost rate; $130,156 of the remaining labor (which had been classified as "administrative" or "holiday") and all of the related bonuses remained in the indirect cost rate for reimbursement.

85.    For fiscal year 2017, spouses of SSI's executives were paid as follows:

| Spouse | Total Hourly Pay | Bonus | Total Compensation |
|---|---|---|---|
| Sarah Ball | $36,420 | $83,000 | $119,420 |
| Jenny Bartlett | $58,080 | $70,800 | $128,880 |
| Celena Thelen | $58,080 | $84,000 | $142,080 |
| Jessica Bartlett | $58,080 | $79,800 | $137,880 |
| | | | |

86.    In 2017, SSI compensated approximately 98 individuals. The above-identified spouses were among the highest paid employees of SSI. The following is a list of the top 15 most highly compensated employees at SSI in 2017:

23

| | | |
|---|---|---|
| 1. | Semenchuk, Andrew W | $356,688.00 |
| 2. | Ball, Adam R | $348,744.00 |
| 3. | Bartlett, Brian M | $348,744.00 |
| 4. | Thelen, Anthony D | $348,744.00 |
| 5. | Bartlett, Jeffrey D | $338,744.00 |
| 6. | Employee A | $144,396.00 |
| 7. | **Thelen, Celena L** | $142,080.00 |
| 8. | **Bartlett, Jessica M** | $137,880.00 |
| 9. | Employee B | $131,896.00 |
| 10. | **Bartlett, Jenny M** | $128,880.00 |
| 11. | **Ball, Sarah K** | $119,420.00 |
| 12. | Employee C | $118,142.00 |
| 13. | Employee D | $114,801.07 |
| 14. | Employee E | $110,791.18 |
| 15. | Employee F | $107,374.00 |

87.    I believe Jenny Bartlett and Sarah Ball received the above-described payroll while also maintaining employment with other entities. On March 12, 2019, Midland Daily News published an article entitled '*Swae' spa offers relaxation – naturally.*' According to the article, in August 2018, Jenny Bartlett opened Swae spa in Midland, Michigan. The article states that Bartlett previously owned Urban Retreat in Midland and before that had a storefront spa in San Francisco.

88.    Swan Valley High School (SVHS) in Saginaw, Michigan posted a profile for Sarah Ball.  The profile states that Sarah Ball has been a teacher at SVHS since 2001. She earned a teaching degree in Special Education from Saginaw Valley State University and a Masters Degree in Learning Disabilities. According to Ball's profile, she has also coached varsity volleyball and is currently the co-advisor of Student Government.

89.    MDOT OCA requested SSI to produce a sample of timesheets for Celena Thelen and Sarah Ball, amongst other employees.  I have reviewed the timesheets for Celena Thelen and Sarah Ball. Both employees have differing signatures appearing on their time-cards.

90.     Based on the foregoing I submit there is probable cause to conclude that SSI included in its overhead rate payroll for hours which were not worked.  MDOT OCA estimated that from 2016 through end of fiscal year 2018, MDOT overpaid SSI approximately $850,360.14 as a result of the fraudulent representations regarding employment of spouses.

**Target Location**

91.     According to Michigan Secretary of State records, Brian Bartlett and Jessica Bartlett reside at the **Target Residence.** In addition, Bay County records list Brian Bartlett and Jessica Bartlett as being the owner of the **Target Residence.** Surveillance has also identified two vehicles matching the description of vehicles registered to Brian Bartlett at the **Target Residence** on June 28, 2019.

92.     Individual A stated that all employees of SSI have remote access capability on their work laptops and mobile phones and can work from anywhere wirelessly, including their residence.  Based on my training and experience it is common for owners and executives to work extensive hours and do so from their residence on nights, weekends, and holidays.

93.     In addition I know individuals typically keep financial records and property tax bills in their personal residences. The type of evidence that could be found at that location include records kept on paper and on digital devices, such as computers, cellular telephones and digital storage media, and devices used to access financial accounts, such as ATM, debit and credit cards, and account identification cards, and safety deposit box keys. Personal financial records, utility bills, and property tax bills can show where criminal proceeds are currently located, transferred to, and/or used for.  For example, according to public records, Brian and Jessica Bartlett own at least six parcels of property in Gibson, Turner, and Whitney Townships in Michigan. Public records for the respective parcels identify the property owner's (Brian and Jessica Bartlett) address as the

25

**Target Residence**. On or about January 29, 2019, Jessica Bartlett wrote checks to Gibson, Turner, and Whitney Township Treasurers from an account which received fraud proceeds.[22] Based on the foregoing, there is probable cause that tax records received from Gibson, Turner, and Whitney Township Treasurers will be found at the **Target Location** which will provide additional evidence regarding the purpose of financial disbursements to the aforementioned treasurers.

94.     In addition personal records, paper and electronic, are likely to contain evidence regarding employment, or lack thereof, of spouses or other individuals by SSI. These records could include schedules, pictures, or messages evidencing to the location of individuals on certain dates and times. This information may corroborate or be in direct contrast to what they stated or records indicate if they were working for SSI at that time.

95.     I submit that upon post-search examination, the records are likely to contain evidence regarding who has access to the digital devices and the financial accounts used by the various entities and individuals; photographic images of people in association with each other; communications with co-conspirators, the State of Michigan, and third parties; information regarding financial transactions; corporate activity records; contact lists; information regarding the location and disposition of the proceeds of the fraud scheme; and on the digital devices, records of online activity.

96.     Based on the above, I submit that there is probable cause to believe that Jeffrey Bartlett, Andrew Semenchuk, Brian Bartlett, Anthony Thelen, Adam Ball and others have participated in a fraud scheme in violation of 18 U.S.C. §§ 1343 and 1349, and money laundering in violation of Title 18 U.S.C. §§ 1956 and 1957, and that evidence of the commission of those

---

[22] Huntington National Bank Account No. xxxxxxx5967 is held in the name of Brian M. and Jessica M. Bartlett. The account received money from accounts held at Huntington National Bank in the names of 2SI Development, LLC and 3SI Building and Leasing, LLC.

criminal offenses and fruits of the criminal activity may be found at **Target Residence**.

_____
Bryan M. Butler, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me and signed in my presence and/or by reliable electronic means

on July 24, 2019.

_____
Patricia T. Morris
United States Magistrate Judge

## ATTACHMENT A

### Location to be searched

2150 M-61, Bentley, Michigan 48613, more fully described a single family home located on the north side of M-61 between Standish Road and Carter Road. The residence is set back from the roadway of M-61 and the majority of the property aside from the driveway is shielded by pine trees. Coming from Standish Road and turning east on M-61, the driveway to the residence is the first one on the north side of M-61. The residence has an attached garage that faces east and to the east of the residence connected to the driveway is a detached utility building with two garage doors facing south.

All building, structures and containers on the property located at 2150 M-61, Bentley, Michigan, 48613. All vehicles on the property used primarily by Brian and Jessica Bartlett or for the operation of Surveying Solutions, Inc. (SSI), 2SI Developments, LLC (2SI), 3SI Building and Leasing, LLC (3SI), National Elevation Certificates, LLC (NEC), or Southfield IT Group.



**ATTACHMENT B**

The subject location shall be searched for fruits of criminal activity and the following records, whether stored in paper or digital format, for Surveying Solutions, Inc., 2SI Developments, LLC, 3SI Building and Leasing, LLC, National Elevation Certificates, LLC (NEC), Southfield IT Group (hereinafter referred to as "Companies"), Andrew Semenchuk, Jeffrey Bartlett, Brian Bartlett, Anthony Thelen, Adam Ball, Courtney Stodolak, Celena Thelen, Jessica Bartlett, Jenny Bartlett, and Sarah Ball:

1. Records pertaining to work proposed, contracted or performed for the Michigan Department of Transportation, or other state or federal agencies, as a contractor or sub-contractor;

2. Records pertaining to the Companies;

3. Any personal financial records relating to the above listed individuals;

4. Records pertaining to the schedule or location of any of the above listed individual.

5. Locked containers or safes wherein any of the above items may be located;

6. Records identifying the location of safety deposit boxes or storage lockers wherein any of the above items may be located. Keys or other instruments necessary to gain access to the safety deposit boxes or storage lockers.

7. All electronic equipment, including cellular telephone, smartphones, desktop computers, laptop computers and tablets used principally for the operation of Companies or used by any of the above listed individuals;

All of the above noted records may be stored on magnetic or electronic media including hard drives, diskettes, tapes, or other media in the form readable by computer. These records include media maintained as archive or backup copies. Also included in magnetic or electronic media are electronic data processing and storage devices, computers, and computer systems including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disks and diskettes, tape drives and tapes, optical storage devices such as keyboards, printers, video display monitors, optical readers, and related communication devices such as modems. Computer equipment, as needed, is defined as follows:

a. Hardware. Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but it not limited to, any data processing devices; internal and peripheral storage devices; input/output devices (such as keyboards, printers, scanners); related communication devices (such as modems, cables, and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b. Software. Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications, utilities, compilers, interpreters, and communication devices.

c. Documentation. Computer related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure hardware, software, or related items.

d. Handwritten or printed notes regarding passwords, finding the file or directory names of important data, operating the hardware or software, identifying the suspect's electronic or telephone connections with co-conspirators and victims, or finding login names or accounts.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

30

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER'S Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic

31

form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

AO 93 (Rev. 11/13) Search and Seizure Warrant

AUSA:   Anca Pop                   Telephone: (989) 895-5712
Special Agent:   Bryan Butler      Telephone:  (989) 892-6525

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Michigan

In the Matter of the Search of                )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)*  )   Case No.   1:19-mc-51081-4
                                               )               Judge: Ludington, Thomas L.
2150 M-61, BENTLEY, MICHIGAN                   )               Filed: 07-24-2019
                                               )
                                               )

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Eastern_____ District of _____Michigan_____.
*(identify the person or describe the property to be searched and give its location)*:

Attachment A

        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Attachment B

        **YOU ARE COMMANDED** to execute this warrant on or before   August 7, 2019 _____   *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to   the presiding United States Magistrate Judge on duty   .
                                                                        *(United States Magistrate Judge)*

        ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
        ☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   July 24, 2019   11:02 am _____        _____
                                                                         *Judge's signature*

City and state:   Bay City, Michigan _____        Patricia T. Morris        U. S. Magistrate Judge
                                                     _____
                                                                 *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|
| |

  I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

                                          _____
                                          *Executing officer's signature*

                                          _____
                                          *Printed name and title*